**ALFRED DUNHILL OF LONDON, INC.**

v.

**KASSER DISTILLERS PRODUCTS CORP. d/b/a Dunhill Distillers Products Co. et al.**

**Civ. A. No. 68–447.**

United States District Court,
E. D. Pennsylvania.

Oct. 26, 1972.

Leslie D. Taggart, Watson, Leavonworth, Kelton & Taggart, New York City, H. Robert Fiebach, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiff.

Donald Brown, Fox, Rothschild, O'Brien & Frankel, E. Arthur Thompson, Paul & Paul, Philadelphia, Pa., for defendants.

OPINION AND ORDER

EDWARD R. BECKER, District Judge.

I. *Preliminary Statement*

This is an action for trademark infringement and unfair competition.[1] It is also the latest in a long series of cases in which the plaintiff, Alfred Dunhill of London, Inc.,[2] has sued to protect its Dunhill mark and name.[3]

As will appear in our findings of fact, the Dunhill name has been well and favorably known throughout the United States for many years. Plaintiff's Fifth Avenue store in New York City, for example, has, for decades, been a mecca

---

1. The complaint is brought under the Lanham Act, 15 U.S.C. § 1051 et seq., and also on grounds of common law trademark infringement and unfair competition. The latter claims are cognizable within the pendent as well as the diversity jurisdiction of this Court (plaintiff is a Delaware corporation and defendant a Pennsylvania corporation). *See*, 28 U.S.C. § 1338(b).

2. Plaintiff is a wholly-owned subsidiary and (since 1921) a related company of Alfred Dunhill Ltd., a British Company, of London, England. Alfred Dunhill Ltd. is the owner of the trademark "Dunhill"; plaintiff is the exclusive user of that mark in the United States on some goods and is entitled to concurrent use with Dunhill Tailored Clothes, Inc. on other goods. As such, it is entitled to bring this action. Moreover, Leslie D. Taggart, Esq., who represents plaintiff, has represented in open court that the British company is on notice of the litigation and that it agrees to be bound by it as well.

3. *Inter alia, see*, Alfred Dunhill of London, Inc. v. Dunhill Shirt Shop, Inc., 3 F.Supp. 487 (S.D.N.Y.1929); Alfred Dunhill of London, Inc. v. Dunhill Shirt Company, 213 F.Supp. 179 (S.D.N.Y. 1963); Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., 293 F. 2d 685, 49 CCPA 730 (1961) cert. denied, 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84; Alfred Dunhill of London, Inc. v. E. Martinoni Co., 161 U.S.P.Q. 368 (T.T.A.B. 1969); Alfred Dunhill of London, Inc. v. Sumner Restaurant, Inc., 67 U.S.P.Q. 35, 36 (N.Y.Sup.Ct.1945); Alfred Dunhill of London, Inc. v. Dunhill Clothiers, Inc., CA No. 7394 (S.D.Ohio 1968); Alfred Dunhill of London, Inc. v. Dunhill's Inc., CA No. 3183 (S.D.Ohio 1968); Alfred Dunhill of London, Inc. v. Dunhill Records, Ltd., et al., CA No. 66–2607 (S.D. N.Y.1969); Alfred Dunhill of London, Inc. v. Dunhill's, Inc., et al., CA No. 2372 (S.D.W.Va.1968). See also the cases listed at n. 17 *infra*.

for sophisticated shoppers. Plaintiff operates similar stores in Los Angeles, Chicago and San Francisco, and formerly operated a store in Philadelphia, a focal point of this litigation.[4] Defendant has never disputed that plaintiff's pipes and tobacco are well known, not only throughout America, but internationally as well. Plaintiff merchandises a wide variety of wares. However, because plaintiff's preeminent identification has been with pipes and tobacco, and because Dunhill is a surname, and arguably a weak mark, defendant Kasser Distillers Products Corp., a Philadelphia based distilling firm, contends that its right to use "Dunhill" as a mark for scotch whiskey, a product not sold by plaintiff, cannot be assailed or enjoined by virtue of this lawsuit.[5]

There are two principal legal issues involved in the case. The first is that of infringement. Within that term we encompass the question of plaintiff's right to protection of its mark against its use as a mark for a product which plaintiff does not sell (and which is dissimilar to products which it does sell), and the concomitant question of likelihood of confusion of source. As will be seen, *infra,* we have no difficulty in concluding, as have many other courts, that the Dunhill mark, though a surname, is entitled to protection. As is customary in this type of case, plaintiff has sought to prove (and has proved) the strength of its mark by the offer of data and physical evidence demonstrating its continuous business in this country since 1921, the nature of that business and its extensive advertising and marketing of Dunhill goods.[6]

Plaintiff has introduced evidence that its wares include a variety of bar accessories. Plaintiff submits that bar accessories and tobacco are goods which are frequently used in conjunction with scotch whiskey and are therefore related in character to it and to other forms of alcohol. Plaintiff contends that there is a strong likelihood that the public will be confused as to the source of defendant's whiskey, and will think it to be the product of the plaintiff. Arguing thereupon from the well-established body of law affording exclusive protection to a distinctive mark as against related, though dissimilar, goods, plaintiff has made out a cogent case for protection. Plaintiff also contends that Kasser is a deliberate infringer who chose to pass off the Dunhill name for its economic advantage.

As will be seen from our discussion, we conclude that the goods of the parties are related and that there is indeed a likelihood of confusion of source. These factors, once established, would, in the ordinary course, and even in the absence of proof of deliberate infringement, entitle plaintiff to relief. There is, however, a second major legal issue involved in this case: the claims of laches and equitable estoppel interposed by the defendant. These defenses stem from plaintiff's delay of five years in instituting this lawsuit after it learned of defendant's appropriation of the Dunhill name for its scotch whiskey. Plaintiff offers a variety of reasons to explain and justify the delay, including defendant's posture in certain Patent Office opposition proceedings, instituted in response to defendant's application for

---

4. There are also Dunhill stores in England, France, Germany and Hong Kong.

5. Throughout this Opinion we shall refer only to the corporate defendant. Plaintiff has neither stated nor proved any claim against defendants Raymond and Victor Kasser as individuals; all of their actions relevant hereto were in their corporate capacities.

6. We received in evidence many different catalogues containing various examples of Dunhill's advertising and promotion.

These catalogues include: the Dunhill Bar Accessories Promotion, 1943–1971; Dunhill Catalogue, Retail (1959–1970) and Wholesale (1964–1971); Dunhill Newspaper and Magazine Advertising, Philadelphia (1963–1967); Dunhill Newspaper and Magazine Advertising (Wholesale and Retail), New York—1962–1963; Dunhill Retail Promotion, New York and National (1961–1964); and Dunhill Newspaper, Opera Program and Magazine Advertising, Philadelphia (1960–1962).

registration of the Dunhill mark resulting in a default by defendant. Plaintiff has pointed out that during the period in question it was proceeding in the courts against four other infringers and has noted the established doctrine that it is not bound to take on more than one infringer at a time. Plaintiff also contends that defendant was not prejudiced by the delay and indeed that defendant's motivation in adopting the Dunhill mark deprives it of the clean hands requisite to assert equitable defenses.

As may be surmised from the foregoing, we find that the facts and the law require that the defendant be enjoined from its use of the mark Dunhill for scotch whiskey. However, before discussing the infringement issues, the equitable defenses, and the other issues raised by the case, we turn first to a recitation of our findings of fact. This Opinion constitutes our findings of fact and conclusions of law under Fed.R. Civ.P. 52(a).

## II. *Findings of Fact*

### A. *The Mark and the Merchandise of the Plaintiff*

The Dunhill mark is attributable to the surname of Alfred Dunhill of London, England, who, prior to September 1921, sold into the United States various Dunhill products. In 1921, plaintiff became, has continued to be, and now is the exclusive distributor in the United States of the Dunhill products of Alfred Dunhill and his successor, Alfred Dunhill, Ltd., a British corporation, also of London, England. Since 1967, plaintiff has been and now is a wholly owned subsidiary of Alfred Dunhill, Ltd. Alfred Dunhill, the son of the founder of Alfred Dunhill Limited, was President of Alfred Dunhill Limited until his death in 1971. Mary Dunhill, the daughter of the founder, is Chairman of Alfred Dunhill Limited and of Alfred Dunhill of London, Inc. Richard Dunhill, grandson of the founder, is Deputy Chairman of Alfred Dunhill Limited.

Plaintiff has sold a broad line of products at retail from its store located in New York City since it opened in 1922, from its Los Angeles store since it opened in 1951, from its Chicago store since it opened in 1960 and from its San Francisco store since it opened in 1961. From 1960 through July 1967, plaintiff also had a retail store at 1516 Chestnut Street, Philadelphia, which carried and sold the goods carried and sold by the other retail stores. Plaintiff has, since long prior to defendants' first use of the mark Dunhill, sold and now sells at its retail stores, *inter alia*, smokers' articles (cigars, pipes, tobacco, lighters and smokers' accessories), gift items (including leather goods, gold and silver accessories, bar accessories, office accessories, luggage and handbags), men's clothing, haberdashery and toiletries. The bar accessories include everything from the smallest accessory to the bar itself. Since 1921, plaintiff has also wholesaled throughout the United States a line of products similar to those sold at its retail stores, including smokers' articles and bar accessories.

All of the goods sold by plaintiff are sold under the tradename and trademark Dunhill. The trademark appears on the packaging and, where possible and practical, on the goods. Plaintiff's retail sales under the tradename and trademark Dunhill during the period 1922–1969 exceeded $70 million, ranging from about $300,000 in 1922 to over $4 million in more recent years. Plaintiff's wholesale sales under the tradename and trademark Dunhill during the period 1933–1969 exceeded $70 million ranging from about $250,000 in 1933 to over $3 million in more recent years.

During the period 1933–1969, plaintiff expended approximately $6,000,000 in advertising and promoting its Dunhill products. Plaintiff's advertising has appeared in newspapers and magazines having both regional and national circulation, e. g., Wall Street Journal, New York Times, New Yorker Magazine, Field and Stream, Harper's Bazaar, Esquire, Playboy, Sports Illustrated,

Vogue and various trade journals. Plaintiff's advertising also appeared in Philadelphia publications during the period its Philadelphia store was open, including the Philadelphia Inquirer and Bulletin and Greater Philadelphia Magazine. Plaintiff's promotion has included "stuffers" sent to charge customers with their bills, and annual retail gift catalogs and wholesale catalogs. During the years 1959–62, plaintiff's gift catalogs also appeared as a supplement to a Sunday paper in each city in which plaintiff had retail stores.

Prior to 1963, Dunhill products were, and they have continued to be, sold throughout the world (see n. 4). Plaintiff is the exclusive or concurrent owner in the United States of the following registrations of the trademark Dunhill issued by the United States Patent Office to its parent Alfred Dunhill Limited:

| Registration No. | Issued |
|---|---|
| 155,951 | June 13, 1922 |
| 527,207 | July 4, 1950 |
| 527,208 | July 4, 1950 |
| 534,705 | December 12, 1950 |
| 539,892 | March 27, 1951 |
| 540,389 | April 3, 1951 |
| 541,949 | May 8, 1951 |
| 634,071 | September 4, 1956 |
| 815,651 | September 20, 1966 |
| 843,143 | January 30, 1968 |
| 843,152 | January 30, 1968 |
| 843,178 | January 30, 1968 |
| 843,193 | January 30, 1968 |
| 843,198 | January 30, 1968 |
| 843,270 | January 30, 1968 |
| 847,942 | April 23, 1968 |
| 858,876 | October 22, 1968 (concurrent use) |
| 858,928 | October 22, 1968 (concurrent use) |
| 858,939 | October 22, 1968 (concurrent use) |
| 858,964 | October 22, 1968 (concurrent use) |
| 859,052 | October 22, 1968 (concurrent use) |
| 863,403 | January 14, 1969 |
| 868,123 | April 15, 1969 |
| 868,124 | April 15, 1969 |
| 869,281 | May 13, 1969 |
| 881,310 | November 25, 1969 (concurrent use) |
| 887,373 | March 10, 1970 |
| 897,228 | August 25, 1970 |

The plaintiff is best known for its pipes and tobaccos, and also for its cigars and other smokers' articles. However, the evidence introduced before us, including photographs of plaintiff's Fifth Avenue store in New York City, and its many catalogues reflect its marketing of a wide variety of other items, principally directed to the sophisticated shopper. This diversity is reflected by such items as leather-lined ladies' handbags, silk or velvet smoking jackets, platinum jacketed lighters, fine china and crystal glassware, toiletries with gold initials on the bottle, grooming items with boar bristles, leather desk sets, men's and ladies' jewelry, luggage, a golf umbrella with a compartment in the handle for beverages, various items of clothing, and even an executive airplane. These items are generally very high in price and cater to those who are affluent or sophisticated (or, we suppose, to those who aspire to be). Indeed, plaintiff displays on its catalogues the Royal Warrant granted to its parent company by the Royal Family. Plaintiff's wares, in general, convey a very "British" feeling. Moreover, consistent with the price of the goods, they appear to be, and certainly convey the impression of high quality. We have already noted that plaintiff's sale of smoking items and bar accessories has assumed a central role in this case because of the related goods claim, thus making appropriate this recitation of how the merchandising of these items relates to the plaintiff's image.

Plaintiff's catalogues show the availability for sale of many different kinds of pipes, with the option of having the tobacco custom blended to each person's taste. By 1962, Dunhill had created 35,000 different blends. One of the features of Dunhill's Fifth Avenue (New York) store is its humidor, a large temperature and humidity controlled room which is the repository of thousands of high quality cigars. The humidor is a place where the connoisseur of fine cigars can have his cigars stored under perfect conditions until he is ready to smoke them. During the period from 1933 to 1969, plaintiff sold at retail over $20 million of Dunhill cigars, over

$4.5 million of Dunhill pipes and over $4 million of Dunhill smoking tobacco.

Dunhill's line of bar accessories is also highly priced. One of the exhibits received in evidence was a leather case containing a complete set of bar tools made of stag horn, silver and ivory including such items as a bottle opener, cocktail pitcher, strainer, knife, fork, tongs, jigger, spoons, corkscrew and ice breaker. The entirety retails for $225. Other Dunhill bar accessories include ice buckets, cocktail shakers, cellarettes with glasses, pocket flasks, leather travel cases for fifths, wine racks, and giant liquor bottles sold either alone for decoration or as a housing for a radio. One department of the Fifth Avenue store and about two pages of each catalogue are devoted to the sale of bar accessories. Although bar accessories do not represent a major portion of the plaintiff's business, between 1933 and 1969 over $2 million of Dunhill bar accessories were sold at retail.

While, as the foregoing discussion indicates, Dunhill was a very well known trademark for pipes long before 1963 and continues to be, it is also a famous trademark and tradename in general, not just for smokers' articles. We find, in fact, that prior to 1963 Dunhill was, and continues to be, a famous tradename and trademark, and that it is in fact a "strong" mark. We further find that "Dunhill" meant and means the plaintiff and its products to the purchasing public. This last stated finding, which relates to the notion of "secondary meaning," is supported by our previously stated findings as to the length and manner of use of plaintiff's mark, the nature and extent of its advertising and promotion, and the efforts made by plaintiff in the direction of promoting a conscious connection in the public's mind between the Dunhill mark and the plaintiff's products. The various items of physical evidence (see n. 6) weighed heavily (along with the testimony of plaintiff's president, Walter Harris) in our reaching this conclusion.

The parties have stipulated, and we accordingly find, that at the present time there are subsisting some six third-party registrations of the name Dunhill on the Principal Register of the United States Patent Office.[7] However, the existence of these other registrations has not affected our findings with respect to the strength of the plaintiff's mark.

The foregoing recitation demonstrates that Dunhill is a surname which has become widely known through its long and continued use, its extensive advertising and sales, and its identification with its product. Because of the issues raised by the defense, it is also appropriate to note that Dunhill is not a geographic location in England or Scotland[8] (or, for that matter, in Pennsylvania), nor is the name identifiable with Scottish tradition.

## B. The Merchandise of Defendants' and Their Selection of the Dunhill Mark

Defendant Kasser Distillers Products Corp. is a Philadelphia firm engaged in the rectifying, bottling and distributing of alcoholic beverages. It is a family firm, and co-defendants Raymond H. Kasser and Victor Kasser substantially own, control and operate the corporation, which was founded by their late father, Samuel Kasser. Defendant markets a wide variety of whiskeys and

---

7. The following trademarks are presently subsisting: Dunhill Personnel Agency, Inc. (employment agency services); Dunhill's Original (candy); Kay Dunhill (dresses); Kay Dunhill, Junior (dresses); Dunhill (shoes), and Dunhill Tailors (men's suits, overcoats and haberdashery). We also note that there were other Dunhill trademarks formerly registered for a variety of goods from automobile tires to cosmetics; however, these marks no longer subsist.

8. There is apparently an inhabited place in Ireland known as Dunhill, but its existence has no significance in this case. Until plaintiff's counsel discovered it, none of the parties was aware of it.

wines. It has conducted business under 29 different trading styles and has often used more than one trademark for the same type of alcoholic beverage. For instance, defendant has used the marks "Bankers Club", "Four Queens", "Kasser's 'Si' ", "Monogram", and "Young's Special" for blended whiskey. It adopted the mark Dunhill for its brand of scotch whiskey in 1963, and thereupon registered the trading style Dunhill Distillers Products Co. with the appropriate Pennsylvania authorities.[9] Defendant first sold Dunhill scotch in Pennsylvania and has since extended its trading area to include the states of Ohio, New Jersey, Maryland, Delaware and the District of Columbia, as well as several cities in Florida and Louisiana. These sales are made either to a state controlled agency or to private distributors.

Defendant's venture into Dunhill scotch was precipitated by a development in the scotch market. In 1963, the public demand for what is known as "light scotch"[10] was rapidly growing and defendant sought to obtain a share of that market. By definition, scotch whiskey is distilled in Scotland (indeed, if it is not, it cannot be called "scotch"), and defendant made purchase arrangements with Seager Evans & Co., Ltd. of London, a firm which distills whiskey in Scotland and sells it to firms which market it under their own label throughout the world and alter the proof of the whiskey by adding distilled water to the unbranded imported goods. Because of tax advantages, defendant arranged to import the scotch in barrels and bottle it in Philadelphia. Defend-

ant had utilized this modus operandi (also purchasing from Seager Evans & Co., Ltd.) a year or more earlier with its Barrister brand of scotch whiskey. Barrister was bottled and sold at 80 proof in quarts; Dunhill is sold at 86 proof in fifths. Otherwise the two whiskeys are the same.

Of critical importance in the case is the reason for the defendant's adoption of the Dunhill mark for its light scotch whiskey. The name was arrived at during a conference involving the late Samuel Kasser and his sons Raymond and Victor Kasser. According to the testimony of Raymond Kasser, the president of defendant, the seed which spawned the decision was the favorable recollection by Samuel Kasser of the name "Dunbar" which he had used for bourbon some years ago. Since the business which owned that name had been sold to Seagram's in 1942, "Dunbar" allegedly could not be used;[11] however, when the elder Kasser suggested the transition from "Dunbar" to "Dunhill," he allegedly received reactions of approbation from the participants in the meeting and all agreed that "Dunhill" be used for the new light scotch. Becoming more specific as to the reasons for the approbation and indeed for the choice of Dunhill, Raymond Kasser testified at one point that Dunhill connoted "stability and depth and quality," and at another that it connoted "stability, age, quality," and at another:

"the word itself is a distinction that feels good. It felt to me like it was an imported product, and it was one of good quality."

9. Defendant also obtained a Pennsylvania trademark registration for the name Dunhill for use on distilled alcoholic liquors. Its efforts to obtain a trademark registration from the United States Patent Office are discussed *infra*.

10. Light scotch consists essentially of a blend of malt whiskey and one or more grain whiskeys and differs from other scotches by the amount of malt whiskey used. Normally, light scotch consists of about 30% malt whiskey and 70% grain whiskey, whereas regular scotch usually

contains about 40% malt whiskey and 60% grain whiskey.

11. This contention is countered by plaintiff, which claims that defendant used the names Kings, Kasko, and Monogram in 1944 a little over a year after they too had been sold to Seagrams. Plaintiff also points out that Dunbar is a Scottish surname (unlike Dunhill, which is English) and indeed the name of a Scottish Royal Burgh, hence more suitable to scotch whiskey than Dunhill.

He also testified that the name had a "British flavor."

At the time that the decision to use Dunhill for its scotch whiskey was arrived at, plaintiff had a store on Chestnut Street in the heart of the prime Philadelphia retail business district. During the three years preceding the decision, plaintiff had regularly advertised its wares in the Philadelphia Inquirer and Evening Bulletin. Raymond Kasser admitted his awareness of the Chestnut Street store at the time that the decision to market Dunhill scotch was made and he testified that he had passed by the store a number of times. Even though he read the Inquirer and Bulletin, he testified that he had no recollection of plaintiff's advertisements, but that "perhaps" he had seen them. He also acknowledged his familiarity with Dunhill pipes since his college days although he disclaimed knowledge of other Dunhill products. Notwithstanding his awareness of the plaintiff and its products, Raymond Kasser steadfastly denied that the plaintiff's name or wares or its Chestnut Street store was mentioned at the selection meeting, and he also denied that they were in his mind, or (insofar as he knew) those of his father or brother at the time the decision to use "Dunhill" was made.

We do not find the testimony of Raymond Kasser as to the basis for the decision to market Dunhill scotch to be credible. We find that defendant adopted the Dunhill mark and name with a consciousness of plaintiff's mark and of the aura surrounding it. And we find that what in fact gave "stability," "depth," "age," "quality," "distinction," a feeling of being imported, and a "British flavor" to the Dunhill name was the defendant's long and successful advertising and use of Dunhill. We are satisfied that the Kasser clan did not believe that they became infringers by using "Dunhill" on scotch whiskey; as laymen, they doubtless felt that they were entitled to use the mark on a product which plaintiff did not sell. However, we are also satisfied that the Kassers were well aware of the benefits which would accrue to them from its use, and that "World Famous Dunhill Scotch" was not and is not world famous.[12]

The defendant's use was and has been successful. The sales of Dunhill scotch have grown from $250,000 in its first year (on advertising of $55,000) to $1,568,000 in 1970 (on advertising of $87,560). Sales of Dunhill scotch totalled over $7.5 million from 1963 to 1970 inclusive. During that same period, defendants have expended the sum of $524,000 for advertising. Dunhill is now the fourth largest selling scotch in Pennsylvania.

On August 19, 1963, defendant filed an application in the United States Patent Office to register Dunhill as a trademark for scotch whiskey, claiming use since April 18, 1963. Plaintiff became aware of defendant's use of Dunhill when its president, Walter Harris, read in the Greater Philadelphia Magazine (in which an advertisement of plaintiff's also appeared) an article about defendant's introduction of Dunhill brand scotch. Legal proceedings, first in the Patent Office and then in the courts, ultimately followed. That the court proceedings did not follow quickly is the source of the equitable defenses, to which we will in due course turn. Before doing so, however, we must make certain findings with respect to the relationship between plaintiff's and defendant's goods and the question of likelihood of confusion.

12. We note too (from Raymond Kasser's testimony) that the use of the name Dunhill was not motivated by the presence of any one relative or acquaintance so named (they had none) nor any geographical reference in Scotland or in the Philadelphia area (there is none). And Raymond Kasser testified that the extent of his travels to the British Isles lay in several trips to London and one to a distillery in Glasgow.

## C. *Relationship of the Plaintiff's and Defendant's Goods; Likelihood of Confusion.*

There was no specific evidence introduced at trial on the subject of the relationship between the goods of plaintiff and those of defendant. However, the matter was argued and briefed by counsel. Goods are related if they are used in conjunction with one another or are associated together in some way in the minds of the consuming public. We consider the determination of whether goods are related to be one upon which we can make findings by drawing inferences from facts which we find to have been proven.

Plaintiff has argued that the inferences to be drawn from the facts are plain—that whiskey and bar accessories are obviously related in character, and that alcohol and tobacco are so commonly used together in social (and non-social) situations that they are related as well. Although we believe these conclusions to be generally true, the analysis upon which they rest is arguably simplistic. Hence, lest our findings as to the relationship of the goods be assaulted as overbroad, we approach the question alternatively on a narrower and more specific basis. As we have noted previously in our findings, the image conveyed by the plaintiff's goods is one of sophistication, high quality, and very "British." As we have also noted, the image sought to be conveyed by the defendant in the marketing of its scotch is precisely the same. These similarities are central to the alternative basis for our finding of association of goods. For even if it did not follow that the average consumer would in general associate whiskey with bar goods or with cigars or pipes, it does, in our view, follow that he would find an association or relationship between the type of wares purveyed by the plaintiff—expensive pipes, tobacco, cigars, bar accessories, smoking jackets and gift items, on the one hand, and scotch whiskey labeled with its coat of arms and advertised with the legend "World Famous Dunhill Scotch" as marketed by the defendant on the other.

Turning to the question of likelihood of confusion of source, the same considerations obtain. We find there to be a strong likelihood that the consuming public will confuse the source of "Dunhill Scotch" with the source of the pipes and tobacco and cigars and bar accessories and other items sold by the plaintiff. The likelihood of confusion is further enhanced by the relationship between plaintiff's and defendant's goods. There are, however, additional bases for our finding of likelihood of confusion. FIRST, the marks involved here are virtually identical in terms of appearance, spelling and pronunciation. SECOND, the bottle and labels used by the defendant perpetrate the attempt to create the impression that Dunhill scotch is a product of high quality and great sophistication. Defendant's primary label (on the front of the bottle) is gold with a black shading around the letters and designs which suggests antiquity. On the label appear the words "Imported" and "Rare Blended Scotch Whiskey," and on the neck label is found a coat of arms, just as a coat of arms is found in the plaintiff's catalogues and other advertising. On the label on the back of the bottle the product is referred to as a "classic scotch. Distilled with the traditional patience and care of the Highland Scots. . . . " While this may well be so, for we intimate no view as to the quality of defendant's product,[13] we note that Dunhill Scotch is one of the lowest priced scotches on the Pennsylvania Liquor Control Board State Store Price List.

THIRD, notwithstanding the inherent difference in the manner of marketing the goods, *i. e.,* whiskey is generally sold only in state owned liquor stores or in so-called package stores, the merchandising efforts of plaintiff and defendant are directed towards markets with a

---

13. We affirm that the sample of defendant's product, received in evidence as Defendant's Exhibit No. 14, remains unopened.

substantial overlap.[14] The plaintiff's products are advertised and sold in most of the areas where defendant markets its scotch, and many scotch drinkers, at least, are individuals to whom plaintiff's goods would have appeal. We also find that the sales of the plaintiff's products are not restricted to its own stores; the products, especially its smoking articles, appear as Dunhill products in department stores, gift shops, smoke shops, drugstores, restaurants and a variety of other kinds of stores throughout the eastern region of the country. Even though there is no Dunhill store in Pittsburgh or Williamsport, Pennsylvania, for example, or many other smaller towns and cities where defendants products are sold; plaintiff's products are advertised in publications which are circulated in such places (see p. 1349), plaintiff's mail orders are available to persons in such places, and people from those areas live close to and doubtless visit New York City. Moreover, Dunhill products are sold in many small towns throughout the eastern seaboard. We find that a substantial number of liquor consumers are aware of the Dunhill products and their reputation even though they may not personally purchase Dunhill products.

On the basis of all the foregoing facts, we find that Kasser's mark "Dunhill" for its scotch so closely resembles Dunhill's registered trademark "Dunhill" as to be likely to cause confusion or mistake or to deceive the consuming public as to the source of the product.

### D. *The Equitable Defenses*

In July 1963, shortly after defendant began marketing its Dunhill scotch, an article appeared in the Greater Philadelphia Magazine about the new product, the keynote of which was a discussion of the new light scotch trend. The article was seen by Walter Harris ("Harris"), plaintiff's president. Harris notified plaintiff's counsel, Leslie D. Taggart, Esq., of the article and initially left to him the course of action to be followed. On August 19, 1963, defendant filed an application in the United States Patent Office to register "Dunhill" as a trademark for scotch whiskey, claiming use since April 18, 1963. On February 20, 1964, a Patent Office Examiner rejected Kasser's application on the grounds that Dunhill was primarily a surname. The Examiner also advised Kasser of a pending application for registration of "Dunhill" for scotch whiskey and gin which had been filed by E. Martinoni & Co., a California distilling firm. Under applicable Patent Office Procedure, Kasser had until August 20, 1964 to respond to the Examiner's decision and did so on August 19, 1964 by asking that the Examiner reconsider his prior decision. On January 13, 1965, the Examiner again refused to register Dunhill on the ground that it was primarily merely a surname. Kasser responded on March 1, 1965 with an affidavit of Victor Kasser to the effect that Dunhill had become distinctive of its scotch. On August 4, 1965, the Examiner, for the third time, refused to register Dunhill. Kasser filed its response on February 3, 1966—one day before the due date. On March 3, 1966, the Examiner finally accepted the mark for publication in the Patent Office Official Gazette, subject to an interference with a pending second application of E. Martinoni & Co. to register Dunhill for Scotch whiskey and gin. On March 23, 1966, Kasser complied with the Examiner's request to submit an India ink drawing of the mark. Notice of publication was mailed on May 16, 1966 and Kasser's application was published for opposition in the Official Patent Office Gazette on June 7, 1966 subject to the Martinoni interference.

---

14. We note, however, that Mr. Harris testified that the plaintiff sells directly to two or three dozen restaurants in New York City which undoubtedly have bars or cocktail lounges. Whether the defendant's scotch appears in those places, and whether the plaintiff's cigars or other products appear in restaurants in other cities is not clear from the testimony.

Shortly after publication, the plaintiff filed Notices of Opposition to both Kasser's and Martinoni's applications on the basis that their uses of Dunhill on scotch and gin was likely to cause confusion, or to cause mistake or to deceive. At that juncture, instead of preparing and proceeding to trial, defendant abandoned its proceedings in the Patent Office and defaulted. On October 21, 1966, the Trademark Trial and Appeal Board sustained the opposition to Kasser's application by default. The Martinoni matter proceeded to trial in the Patent Office. After trial, the Trademark Trial and Appeal Board sustained the opposition as to Martinoni [15] (see discussion *infra*).

As we have noted above (see n. 3), plaintiff has constantly been in litigation with merchants who have attempted to use the Dunhill name. From 1963 to the time of the filing of this suit in 1968, plaintiff was prosecuting four other trademark infringement suits against users of the mark Dunhill in New York, Ohio and West Virginia (*i. e.*, the last four cases mentioned in n. 3 *supra*). Those users had not attempted to register

in the Patent Office. In addition, on July 2, 1969, plaintiff filed suit against Martinoni because it had continued to use the Dunhill mark after having lost in the Patent Office. All of these suits were settled before trial.

The present suit was not filed until February 28, 1968. Plaintiff's explanation for its delay in filing suit between the time Harris discovered defendant's use of the Dunhill mark and that date is mainly taken from Harris's testimony and is essentially as follows. As to the first period, *i. e.*, between July 1963 and the date of Kasser's default in the opposition proceedings, plaintiff took the position that, since defendant, unlike the merchants whom plaintiff had sued in New York, Ohio and West Virginia, had chosen the Patent Office as a forum to litigate its right to register the Dunhill mark, plaintiff would prefer to litigate the matter there, rather than sue under the Lanham Act or at common law.[16] As to the second period, *i. e.*, after the Kasser default in the Patent Office, the testimony indicates that Harris assumed that concomitant with the default, defendant would abandon the

15. Any inter partes proceeding (cancellation, opposition, interference, etc.) before the Patent Office in the trademark area is governed by the Trademark Rules of Practice which follows the Federal Rules of Civil Procedure, except as otherwise provided. The major difference between litigation in the Patent Office and that in the courts is that the Patent Office does not conduct live examinations of witnesses; however, the parties may introduce testimony via transcripts of depositions or written questions and answers. Otherwise the trademark rules provide for notice, discovery, briefs and oral arguments in addition to the rights under the Federal Rules. The trademark rules are found in Part 2 of Title 37 of the Code of Federal Regulations.

16. We also find that the plaintiff's intention of resolving the matter in the Patent Office is supported by correspondence between Mr. Taggart and Mr. Harris. On October 18, 1963, Mr. Taggart informed Mr. Harris that the defendant had filed an application in the Patent Office to register Dunhill for its scotch

on August 19, 1963, claiming use since April 18, 1963, but that it was not yet ripe for opposition since the application had not been published. On January 24, 1964, Mr. Taggart informed Mr. Harris that Martinoni had made application to register Dunhill and that he had been unable to find any evidence that Kasser's application had been published. Mr. Taggart further stated, "It is entirely possible that the Patent Office, on its own motion, will declare an interference between these two." On April 26, 1965, Mr. Taggart informed Mr. Harris of another application by Martinoni to register Dunhill, in which he stated, "Possibly the explanation new application is the possible 'interference' referred to in our letter of January 24, 1964."

Since an interference is the Patent Office procedure under which prior rights as between two parties are determined, it was not unreasonable for the plaintiff to have awaited that result, thereby obviating the necessity of proceeding against both parties.

Dunhill mark, and that it was only after a further investigation in September of 1967, which revealed defendant was still using the mark, that the decision to sue was reached.[17] Plaintiff also took the position that, because of the enormous expense of litigation, it is not required to pursue numerous lawsuits at one time in order to protect its mark. The testimony also reveals that these corporate decisions were made upon the advice and recommendation of counsel in conjunction with the parent corporation.

We credit plaintiff's explanation for its delay in filing suit, and do not find that plaintiff acted unreasonably or slept on its rights. We also find no evidence of affirmative or open acquiescence by the plaintiff in the defendant's continued use of Dunhill for its scotch. Not only were there no letters or other communications between the parties from which we could construe that the plaintiff might have misled the defendant into believing that it acquiesced in the defendant's continued use of Dunhill, there were no communications of any sort between the parties prior to the filing of this suit. Furthermore, we incorporate our previous finding, relevant on this point, that defendant had knowledge of the plaintiff's use of Dunhill prior to the defendant's adoption of the mark in 1963 and adopted the mark with measured awareness of the advantages it would confer.

Defendant has asserted that the delay in filing suit prejudiced it financially. The yearly total sales and corresponding advertising expenditures made by Kasser in the sale of Dunhill scotch in the years prior to the filing of this suit were as follows:

| Year | Sales | Advertising |
|---|---|---|
| April 1963–64 | $ 250,000 | $55,000 |
| 1965 | 720,000 | 67,000 |
| 1966 | 900,000 | 70,250 |
| 1967 | 1,117,000 | 78,380 |
| Total | $2,987,000 | $270,630 |

While defendant did indeed expend substantial sums and devote substantial efforts and resources to the promoting and advertising of Dunhill Scotch in those years, its sales also increased markedly and we find no concrete evidence that plaintiff's conduct resulted in prejudice.

E. *The Fourth Affirmative Defense— Alleged False and Fraudulent Statements*

In addition to its affirmative defense of laches, the defendant has alleged that the plaintiff, through several corporate officers, intentionally made false and fraudulent statements in order to procure and maintain its 28 registered trademarks. We find that no such false and fraudulent statements were intentionally or otherwise made.

On February 7, 1966, plaintiff applied for numerous trademarks, five of which were eventually accepted for registration on the Principal Register on October 22, 1968.[18] These marks are among those relied upon by the plaintiff in its amended complaint filed on October 28, 1968. On December 22, 1970, the plaintiff supplied certain documents, including Mr. Harris's affidavit, to the Patent Office in a cancellation proceeding which it was

17. Plaintiff also notes that even after the default, the Martinoni case was still pending in the Patent Office and that, since that case raised precisely the same issue (Martinoni had also sought to register Dunhill for scotch), it had the right to assume that Kasser would accept the decision in that case, if it did not abandon the use after its own default.

18. On February 7, 1966, the plaintiff made application to register the trademark Dun- hill for the following goods: application No. 238,190 covering items in Class 23– cutlery, machinery and tools and parts thereof; application No. 238,192 covering items in Class 28–jewelry and precious metal ware; application No. 238,194 covering items in Class 32–furniture and upholstery; application No. 238,196 covering items in Class 37–paper and stationery; and application No. 238,199 covering items in Class 51–cosmetics and toilet preparations.

prosecuting against SCOA Industries, Inc. SCOA was the assignee from Block Shoe Stores Inc. of the Dunhill trademark for shoes which Block had registered in 1950 and renewed in 1970. The defendant alleges that in both the registration and cancellation proceedings, statements were made to the Patent Office on behalf of plaintiff by its President Harris and by Eric Harvey, President of the British parent company, that plaintiff had the *exclusive* right to use the trademark Dunhill when, in fact, prior litigation in the Patent Office and federal courts had resulted in a determination that, as to certain types of goods, the plaintiff was only entitled to a *concurrent* use and registration of the Dunhill mark with Dunhill Tailored Clothes, Inc.

The litigation between plaintiff and Dunhill Tailored Clothes, Inc. is adverted to in n. 3 *supra*. Dunhill Tailored Clothes is a men's clothier in New York City which, for many years, was patronized by Arthur D. Schulte who was a director of plaintiff. The Dunhill Tailored Clothes litigation is so well known in the field of trademark law that it prompted an article, Callmann, The Right to Use v. The Right to Register: The Dunhill Case, 51 TMR 1209 (1961). The principal litigation, in three stages, was tried before Judge Dimock in the District Court for the Southern District of New York.[19] While Judge Dimock found likelihood of confusion, his ultimate decree that Dunhill Tailored Clothes, Inc. had concurrent use rights to clothing, jewelry, toiletries, haberdashery, flat leathergoods, luggage

and silent valets was essentially bottomed upon the notion of estoppel, stemming from the close association of plaintiff's representatives, and particularly Mr. Schulte, with Dunhill Tailored Clothes for over twenty years. This association caused Judge Dimock to find an implied assurance to Dunhill Tailored Clothes that it might continue to use the Dunhill mark. We take judicial notice of the existence of the Dunhill Tailored Clothes litigation in our findings.

The affidavits of Mr. Harvey filed in connection with the registrations are dated January 13, 1966. They stated, *inter alia*, that

> "to the best of his knowledge and belief no other . . . corporation . . . has the right to use said mark in commerce, either in the identical form or in such near resemblance thereto as to be likely, when applied to the goods of such other person, to cause confusion. . . . "

Following an initial refusal of the applications by the Examiner, the plaintiff filed the following amendment, verified by Mr. Harvey's affidavit:

> "The mark has become distinctive of applicant's goods as a result of substantially exclusive and continuous use in commerce for the five years next preceding the date of filing of this application."

However, on December 4, 1967 the plaintiff filed an "Amended Statement and Verification" in which it noted an exception to its prior claim of exclusive use in the form of the right to concurrent use with Dunhill Tailored

---

19. Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., 119 U.S.P.Q. 325 (S.D.N.Y.1958); Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., C.A. No. 65–1342 (S.D.N.Y. July 12, 1965); Alfred Dunhill Limited v. Dunhill Tailored Clothes, 152 U.S.P.Q. 692 (S.D.N.Y.1966). These parties have also been involved in the following litigation: Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., 124 U.S. P.Q. 343 (T.T.A.B.1960) rev'd, 130 U.S.P.Q. 412 (CCPA 1961), cert. denied 133 U.S.P.Q. 702 (Opposition Proceeding); Dunhill Tailored Clothes, Inc. v. Alfred Dunhill of London, Inc., Concurrent Use No. 258 (T.T.A.A.1964); Dunhill Tailored Clothes, Inc. v. Alfred Dunhill Limited, 148 USPQ 386 (T.T.A.B. 1965) (Opposition Proceedings); Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., Opposition No. 45,832 (T.T.A.B.1968); Alfred Dunhill Limited v. Dunhill Tailored Clothes, Inc., Concurrent Use No. 315 (T.T.A.B.1968).

Clothes, Inc. on certain articles. The amendment was verified by Mr. Harvey's affidavits to the same effect.

These amendments were known to the Trademark Trial and Appeal Board and resulted in a decision that the applications in question were accepted as concurrent use registration with Dunhill Tailored Clothes, Inc. Likewise, the plaintiff's application for cancellation of the SCOA mark contained copies of every Dunhill trademark as it appears in the Principal Register. On each one it is noted whether that particular trademark is subject to the rights of Dunhill Tailored Clothes for concurrent use on those particular goods and therefore whether the plaintiff has had exclusive use of the trademark.

The foregoing subsidiary findings lead us to two conclusions. First, we are satisfied that plaintiff did not make false statements in connection with the 1966 registration proceedings or the 1970 proceedings for cancellation of the SCOA mark. The facts of the Dunhill Tailored Clothes litigation were in due course appended to the proceedings, and, in any event, were actually or constructively known to the Patent Office and Trademark Trial and Appeal Board as reported decisions of the courts or Patent Office. Secondly, we are satisfied that, if false statements were indeed made, they were not made intentionally or with a fraudulent purpose. The Dunhill Tailored Clothes situation was a matter of wide public knowledge and we do not agree with defendant's allegations that the alleged failure to recite the Dunhill Tailored Clothes concurrent use constituted an act of fraud.

### III. *Discussion*

#### A. *Introduction*

The extensive findings of fact which we have made do not obviate the need for a discussion of the applicable statutes and caselaw. While questions such as the distinctiveness and concomitant strength of the Dunhill mark, likelihood of confusion and the reasonableness of

the plaintiff's delay in bringing suit are principally questions of ultimate fact, their determination cannot be, and has not been, made in a vacuum. Therefore, we now turn to a discussion of statutory and common law precedent against which we must test our factual conclusions. As we noted, the plaintiff has registered its mark on the Principal Register for a variety of products so that the matter of the trademark infringement is a statutory, as well as common law question.

#### B. *The Strength of the Plaintiff's Mark*

██ Central to the plaintiff's case is the question of the "strength" of its mark, for such "strength" or "weakness" will in large part determine the scope of protection to be afforded the mark—the stronger the mark, the broader the protection. As is noted in 3 Callmann, Unfair Competition, Trademarks and Monopolies, § 82.1(1), pp. 755–56 (3d ed. 1969):

> "In essence, the distinctiveness and popularity of the trademark will determine its relative strength or weakness and will, accordingly, define the scope of protection to be accorded the mark against the confusing similarity of others. A mark is strong if it is conspicuously distinctive; it is distinctive if the public has already been educated to accept it as the hallmark of a particular source. Then, too, a mark can be distinctive either because it is unique, that is, distinctive in itself, because it has been the subject of wide and intensive advertisement, or because of a combination of both. . . . It seems to follow as a necessary conclusion that the trademark has the advantage of strength where its owner has invested a considerable amount in advertising, or can establish use over a substantial period of time on a great quantity of articles, as symbolic of his business, or has also used the mark as a corporate name." [Footnotes omitted.]

██ The question of the strength of plaintiff's mark is especially important

in this case inasmuch as the allegedly infringing mark is applied to non-competing (although related or associated) goods since, in general, a weak mark enjoys protection only against similar goods similarly marketed even though there may be a likelihood of confusion. 3 Callmann, *supra,* § 82.1(1), pp. 757–58. We thus must confront the question of whether the plaintiff's mark is distinctive, and thus strong, or in the absence of distinctiveness whether the mark has acquired a secondary meaning. An affirmative answer to either inquiry will justify our enjoining the use of the mark even on noncompeting goods. On the record before us, we hold the plaintiff's mark "Dunhill" is distinctive at least as to plaintiff's principal goods and must be afforded the protection of a "strong" mark; we further hold that it has acquired a secondary meaning.

■ Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), allows registration of a mark "which has become distinctive of the applicant's goods in commerce." In addition, proof of substantially exclusive and continuous use of the mark for five years will be accepted as prima facie evidence that the mark is distinctive. Section 2(f) allows registration of distinctive marks even though they might fall within Section 2(e), *i. e.,* those marks which are descriptive, primarily merely a surname, or geographical. Judged by these criteria, it is clear to us that the plaintiff's mark "Dunhill" is distinctive, at least when applied to pipes, tobacco, cigars and gift items including bar accessories. We have found that plaintiff had been marketing and advertising Dunhill pipes, tobacco and cigars for some thirty to forty years prior to defendant's use of Dunhill for scotch in 1963 and had been marketing bar accessories, among other gift items, for at least thirty years prior to that time. We have also found that plaintiff has expended very substantial sums (particularly so in view of the relatively meager advertising budgets of yesteryear) in building up its mark, reputation and good will, especially in these areas.

Plaintiff has been advertising in New York since 1922. The New York advertising at the very least covers the northern New Jersey area where defendant markets its scotch. Plaintiff was also advertising nationally and internationally decades before defendant introduced its scotch, and much of that advertising had reached Philadelphia. We have found that this advertising has been successful and that Dunhill has become a world famous mark, symbolic of expensive (if not extravagant) imported (and especially British) merchandise of high quality. Moreover, we have also found that plaintiff's advertising and marketing has been successful in identifying in the public mind the plaintiff's products, and particularly pipes, tobacco, cigars and gift items including bar accessories with a particular source— the plaintiff. We note too that plaintiff's corporate name and trademark are virtually identical. *See* Sweetarts v. Sunline, Inc., 380 F.2d 923 (8th Cir. 1967). All of these factors demonstrate the distinctiveness and popularity of the plaintiff's trademark in the minds of the public. We therefore find the mark to be a "strong" mark.

■ Our finding is unaffected by the defendant's assertion that the mark in question is primarily merely a surname and that plaintiff is thus incapable of gaining rights in the name. First, trademark rights develop through use, Haviland & Co. v. Johann Haviland China Corp., 269 F.Supp 928 (S.D.N.Y.1967), and the plaintiff has demonstrated its trademark rights through long uninterrupted use of the mark at least as applied to pipes, cigars and gift items including bar accessories. We are supported in our conclusion by the decision in Du Barry of Hollywood, Inc. v. Richard Hudnut, 323 F.2d 986 (9th Cir. 1963). There, the court enjoined the defendant's use of "Du Barry" for hairnets as against the plaintiff's registered trademark "Du Barry" for cosmetics even though it is a name of an historic personage and had been popularized to some

extent by the entertainment industry. The court stated:

"We believe that the long use of the 'Du Barry' name on Hudnut's products for women has created for Hudnut a name fanciful in character, which suggests a broad class of related products produced or sponsored by appellee [Hudnut]." Du Barry v. Richard Hudnut, *supra* at 988.

A different result might be reached if the founder of the defendant or someone in its organization were named Dunhill and the plaintiff were in its nascent stage of business growth. The purpose of denying trademark rights to surnames and geographic places, like descriptive words, is to keep in the public domain words that are not the result of one's imagination or personal efforts, so that the vocabulary and choice of words is not inequitably depleted. Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 906 (3d Cir. 1952). But where, as here, the plaintiff is not depriving the defendant or its owners of its right to use its surname or where the origin or geographic identification of the products has nothing to do with the products involved, 3 Callmann, *supra*, § 72, p. 196, this principle does not apply.

 Secondly, in addition to the finding that plaintiff's mark is distinctive, we find that the plaintiff's trademark has acquired secondary meaning in the use of its mark, at least vis-a-vis the above mentioned products. While the factual data necessary to support secondary meaning is similar to that which is used to support a finding of distinctiveness, there is a difference in emphasis. While the determination of distinctiveness and strength of the mark stresses the popularity and acceptance of the mark, in order to show secondary meaning, the plaintiff "must show that the primary significance of the term in the

minds of the consuming public is not the product but the producer." 3 Callmann, *supra* § 77.1, pp. 338–39. *Accord*, Sears Roebuck & Co. v. Johnson, 219 F.2d 590 (3d Cir. 1955).[20] In determining the existence of secondary meaning, courts generally evaluate the following criteria, even though it is not an exhaustive list:

"(1) the length and manner of its use, (2) the nature and extent of advertising and promotion of its mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between that name or mark and a particular product or venture. [footnote omitted]." 3 Callmann, *supra* § 77.3, p. 349.

The findings we have recited on this point are in harmony with these principles and we incorporate them here.

In a sense, this case is unique to the extent that our conclusions as to the strength of plaintiff's mark derive from more than the application of general trademark principles to the facts as we have found them. For, in view of the prior litigation over the plaintiff's mark (see n. 3), we are also able to rely upon previously decided cases dealing with the very mark in question.

We note that in Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., 119 U.S.P.Q. 325 (S.D.N.Y.1958), Judge Dimock, in essence, held that the plaintiff's mark was distinctive or that it had acquired secondary meaning. Likewise, in Dunhill Tailored Clothes, Inc. v. Alfred Dunhill Limited, 148 U.S.P.Q. 386 (T.T.A.B.1965), the Trademark Trial and Appeal Board stated:

"There can be no question but that applicant has established valuable rights in the mark 'Dunhill' as a result of extensive use thereof over many years."

Finally, in Alfred Dunhill of London, Inc. v. E. Martinoni Co., 161 U.S.P.Q. 368,

---

**20.** It has been suggested that a more accurate definition of secondary meaning would be that:

"the primary significance of the term in the minds of the consuming public

is 'not the product but a producer.'" 3 Callmann, *supra*, § 77.1, pp. 339–40, n. 60. See, Barton v. Rex-Oil Co., 2 F.2d 402 (3d Cir. 1924).

369 (T.T.A.B.1969), the Board, in sustaining opposition and refusing registration to Martinoni (for gin and scotch whiskey), stated:

> "In this regard, there can be no question on the record presented in this case but that 'Dunhill' is well and favorably known as a trademark or trade name used by opposer for a wide variety of goods *including cigars and bar accessories.*" (Emphasis added.)

## C. Is Defendant an Infringer? The Question of Likelihood of Confusion

The test of statutory trademark infringement is set forth in the Lanham Act, 15 U.S.C. § 1114, and codifies the test of infringement at common law. That test is whether:

> "[A]ny reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake, or to deceive. . . .*" (Emphasis added.) 15 U.S.C. § 1114(1)(a).

Thus, the gravamen of the cause of action is whether the defendant's use of its mark would be likely to cause confusion as to the source or origin of its products. Dunhill's failure to introduce any instances of actual consumer deception in this case does not impair its claim. Telechron, Inc. v. Telicon Corp., 198 F.2d 903 (3d Cir. 1952); Villager, Inc. v. Dial Shoe Co., 256 F.Supp. 694 (E.D.Pa.1966). However, since plaintiff and defendant are not in direct competition for sale of the same products, before reaching the question of likelihood of confusion, we must first address the law as it relates to the scope of protection to be afforded the plaintiff's mark against non-competing goods.

The argument made by the defendant that a trademark monopoly should not be extended to include non-competing goods has been forcefully presented before. In Triangle Publications v. Rohrlich, 167 F.2d 969 (2d Cir. 1948), the plaintiff, owner of the registered trademark "Seventeen" for a girls' magazine, successfully enjoined the defendant's use of "Miss Seventeen" on girdles. Judge Jerome Frank, in dissent, railed at what he considered to be an unwarranted doctrinal extension by affording protection to a publisher's mark against a product in which the publisher did not deal and had no intention of dealing. Airing his philosophy on the subject of trademark protection, he added:

> "Question has been raised as to whether the trade-name doctrine, by its creation of 'perpetual monopolies,' has not injured consumers, a question of peculiarly serious import in these days when living-costs are notoriously oppressive. Since, however, the Supreme Court has approved the doctrine, an intermediate court (such as ours) must enforce it. But, in the absence of legislation so requiring, we should not expand it.
>
> . . . . . .
>
> Without doubt, the judge-made trade-name doctrine or concept fosters monopolies; and, generally speaking, the common-law tradition is inimical to monopolies (although opposition to monopoly when it takes the form of an obsessive monopoly-phobia becomes absurd). Some writers, disturbed by the suggestion that judicially-protected trade-names are monopolies, protest that the judicial protection of trade-names rests on prevention of unfairness between competitors, not on protection of monopoly. But, no matter by what doctrinal path the courts arrive at their results in this field, the judicial restraints of defendants do yield plaintiffs' monopolies. To the practical, social consequences of their decisions, the courts ought not shut their eyes. . . ." (footnotes omitted). 167 F.2d at 980–981, 982.

Notwithstanding this forceful expression by an influential judge, the law has not evolved in that direction. The justification for affording trademark protection beyond competing markets is best expounded in the landmark decision

of Judge Frank's distinguished colleague, Judge Learned Hand, in Yale Electric Corp. v. Robertson, 26 F.2d 972 (2d Cir. 1928):

"Therefore it was at first, a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? . . . The law often ignores the nicer sensibilities.

However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful. . . ."

The defendant cites several older cases [21] as authority for not extending protection of the "Dunhill" trademark to non-competing goods and these at first blush appear persuasive. However, those cases were decided on the basis of the Trade-Mark Act of 1905, which read in pertinent part:

"[T]rademarks which are identical with a registered or known trademark owned and in use by another and appropriated to merchandise of the *same descriptive properties* . . . shall not be registered." (emphasis added).

The Lanham Act, adopted in 1946, specifically deleted this requirement and thus conformed the statutory requirements to the caselaw that seemingly disregarded the former language as a criterion for registration. *See* Callmann, *supra* § 82.2(c). While there are a legion of pre-Lanham Act cases establishing the principle that non-competing goods can be enjoined, the following are representative. *See, e. g.,* Wall v. Rolls-Royce of America, 4 F.2d 333 (3d Cir. 1925) (cars v. radio tubes); Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, 20 F.Supp. 703 (E.D.Pa.1937) (food v. radios, washing machines and refrigerators); Ford Motor Co. v. Ford Insecticide Corp., 69 F.Supp. 935 (E.D.Mich.1947) (cars v. insecticides); Tiffany & Co. v. Tiffany Productions, 237 A.D. 801, 260 N.Y.S. 821 (1932), aff'g 262 N.Y. 482, 188 N.E. 30 (1933) (jeweler v. motion pictures); The Eastman Kodak Cycle Co., 15 R.P.C. 105 (High Ct. of Justice, Chan.Div., 1898) (cameras v. bicycles); Kotabs Inc. v. Kotex Co., 50 F.2d 810 (3d Cir. 1931) (sanitary pads v. tablet for menstrual pain); Akron-Overland Tire Co. v. Willys-Overland Co., 273 F. 674 (3d Cir. 1921) (cars v. tires).

Among the post-Lanham Act cases supporting the principle to which we have referred are: Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245 (4th Cir. 1970) (satellite communications systems v. communications computers); Triangle Publications Inc. v. Standard Plastic Products, 241 F.Supp. 613 (E.D. Pa.1965) (magazine v. Luggage); Gant of New Haven, Inc. v. Chez Boye Parfums Intern., Inc., 256 F.Supp. 982 (M.D.Fla.1966) (shirts v. men's toiletries); Beef/Eater Restaurants, Inc. v. James Burrough, Ltd., 398 F.2d 637 (5th Cir. 1968) (gin v. restaurants); Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830 (7th Cir. 1963) (optical devices v. refrigeration and heating systems).

---

21. Best & Co., Inc. v. Miller, 167 F.2d 374 (2d Cir. 1948), where the court applied pre-Lanham Act law since the case was litigated in the district court prior to the effective date of the Lanham Act;

Beech-Nut Packing Co. v. P. Lorillard Co., 299 F. 834 (D.N.J.1924), aff'd 7 F.2d 967 (3d Cir. 1925), aff'd 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810 (1927).

The caselaw, then, has been consistent and provides ample support for the proposition that the use of a mark on dissimilar goods can be enjoined. We follow that caselaw here.

The defendant relies heavily upon Westward Coach Mfg. Co. v. Ford Motor Co., 388 F.2d 627 (7th Cir. 1968). In that case the plaintiff, a manufacturer and seller of campers and trailers under the mark "Mustang" used in conjunction with a representation of a charging horse, sued Ford Motor Co. for damages and an injunction to restrain its use of "Mustang" on its cars. The Court of Appeals affirmed the district court's summary judgment dismissal of plaintiff's complaint. The defendant directs us to language in the opinion which indicates that plaintiff's right in the mark "Mustang" would not be extended to include automobiles because campers and trailers and automobiles are unrelated and are not "similar goods similarly marketed." However, a careful reading of the opinion reveals that it enhances the plaintiff's position, for what the court in fact held was that plaintiff's mark was weak and that the scope of protection for weak marks is limited to "similar goods similarly marketed." The court also noted the complementary doctrine, equally well established, that strong or distinctive marks such as that of the plaintiff will be protected from infringement even on non-competing goods. This especially holds, as we noted earlier, where the goods are related in character.

■ We have found that the products of the parties are related products, although physically dissimilar and non-competing. While each case must be judged on its own facts, we feel that the relationship between bar accessories, cigars and pipes, on the one hand, and scotch whiskey on the other is as close, if not closer, than those pre and post Lanham Act cases that we have cited *supra.* Moreover, our finding of relationship is double knit, stemming not just from use, but also from the image and the marketing appeal of the goods.

Our conclusions in this regard are supported by several cases. In John Walker & Sons, Ltd. v. Tampa Cigar Co., 124 F.Supp. 254 (S.D.Fla.1954), aff'd, 222 F.2d 460 (5th Cir. 1955), the court found:

"17. Whiskey and cigars are closely related in distribution and use. Hotels, restaurants and bars supply cigars as well as whiskey to their guests and customers. People frequently smoke cigars while drinking whiskey."

In addition, in Alfred Dunhill of London, Inc. v. E. Martinoni Co., *supra* at 369, the Trademark Trial and Appeal Board stated:

"And, considering this factor [notoriety of the plaintiff's trademark] together with the intimate social relationship between tobacco products and alcoholic beverages and bar accessories, we are of the opinion that persons encountering applicant's 'Dunhill's' gin and scotch whisky might well attribute origin thereof to opposer or suppose that there is some business or other relationship between opposer and applicant." [Footnote omitted.]

We follow the Board's finding here on the question of relationship of the goods. We will also follow it (see *infra*) on the subject of likelihood of confusion.

■ We also agree with the approach represented by the court's opinion in Carling Brewing Co. v. Philip Morris, Inc., 297 F.Supp. 1330 (N.D.Ga.1968), where the court enjoined the defendant's use of "Black Label" on its cigarettes as likely to cause confusion with the plaintiff's use of "Black Label" on its beer. The court held that the competition between the products does not prevent the issuance of an injunction; instead, it is but one of many factors to be considered in determining likelihood of confusion. And, in our view, the relationship of the goods in the minds of the public is more properly evaluated as a factor in assuming likelihood of confusion than it is in attempting to define a *per se* exclusion for unrelated,

noncompeting and dissimilar goods.[22] In other words, the more likely it is that the ordinary purchaser would associate the goods, the more likely it is that confusion of source exists. Such an approach finds ample support in the cases. *See* Sears, Roebuck & Co. v. Johnson, 219 F.2d 590 (3d Cir. 1955); Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967); Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495 (2d Cir. 1962); Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149 (9th Cir.), cert. denied, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963); Restatement (Second) of Torts, §§ 729–31 (Tent. Draft No. 8, 1963). But because the relationship of the goods is but one factor to be considered in likelihood of confusion, we turn to the other factors which support our holding.

■ The Restatement (Second) of Torts, *supra* § 729 catalogues the important factors to be weighed on the issue of likelihood of confusion:

"(a) the degree of resemblance between the designation and the other's tradename, trademark or certification mark in

(i) appearance;

(ii) pronunciation of the words involved;

(iii) translation of the words involved;

(iv) verbal translations of the pictures or designs involved;

(v) suggestiveness, connotation or meaning of the actor's designation and the tradename, trademark or certification mark involved;

(b) the intent of the actor in adopting and using the designation;

(c) the similarity of circumstances and conditions surrounding the purchase of the goods or services involved;

(d) the degree of care likely to be exercised by purchasers of the goods or services involved."

A review of these criteria compels us to grant the injunctive relief requested.

■ As noted in our findings of fact, the marks are virtually identical in appearance, spelling and pronunciation. We also have found that the products are related not only because they are so commonly used together, but also because of the suggestiveness, appeal or image created or attempted to be created by defendant's goods, i. e., "age," "stability," "British flavor," vis-a-vis those of plaintiff. We have not found that the adoption of the "Dunhill" mark by the defendant was fraudulent, but we have also found that it was not innocent. *See* Robert Bruce Inc. v. Sears, Roebuck & Co., 343 F.Supp. 1333, 1349 (E.D.Pa.1972). Even though an intent to infringe is not necessary to a successful infringement action, 3 Callmann, *supra* § 82.2(b)(1), our finding of non-innocent adoption aids the plaintiff's case. We also believe that the average liquor consumer is not likely to exercise a high degree of care in his purchases of a relatively low cost item such as a bottle of scotch. And, we agree with the court in Duff (Distillers) v. Frankfort Distilleries, 129 F.2d 695 (CCPA 1942), where it stated:

"Those who comprise the general public in the purchase of whiskey are not connoisseurs and they order the commodity simply according to name or brand."

*See also* Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., 395 F.2d 457, 462 (3d Cir. 1968). The class of

22. The justification for expanding the scope of protection of trademarks beyond competing goods is partially the result of the widely recognized and increasingly prevalent business practices of diversification, merger, conglomeration, etc. Such practices enhance the likelihood that consumers will believe that the plaintiff has diversified or expanded its sales to include the line of goods sold by the defendant. See Carling Brewing Co. v. Philip Morris, Inc., 297 F.Supp. 1330, 1337 (N.D.Ga.1968); Restatement (Second) of Torts, § 731, comment (a) at pp. 104–05 (Tent.Draft No. 8, 1963).

adults who are liquor consumers should include almost anyone, for almost anyone—indeed even a teetotaller—might be placed in the position of buying liquor for parties, guests or for other isolated occasions. The non-connoisseurs are especially susceptible to confusion as to the source of the defendant's scotch. The likelihood of confusion is exacerbated by the defendant's use of Dunhill Distillers as its tradename. This casts even more doubt on the defendant's intent when it is incorporated as Kasser Distillers Products Corp. (using its family name), as it not only adopted the plaintiff's mark, but also a close derivation of the plaintiff's tradename. We find that Dunhill is the prominent word in both tradenames and, therefore, the likelihood of confusion of the source of the scotch would be enhanced by the use of similar tradenames.[23] *See* Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (2d Cir. 1954).

The findings of fact which we have made on the subject of likelihood of confusion and the foregoing discussion comport with the result reached by the Trademark Trial and Appeal Board in the case of Alfred Dunhill of London Inc. v. E. Martinoni Co., *supra.* In that case, the Board had before it precisely the same question as do we: is the public likely to be confused by the use of "Dunhill" on scotch whiskey? The Board held (see p. 36 *supra*) that persons encountering Martinoni's Dunhill scotch might well attribute the origin thereof to the plaintiff. Needless to repeat, we agree, and on the basis of our findings of fact and the foregoing discussion, we hold that the plaintiff's mark is entitled to protection and that the defendant's use of "Dunhill" on its scotch is likely to cause confusion, to deceive or to cause mistake in the minds of the purchasing public as to the source of the defendant's goods. Therefore, the plaintiff is entitled to an injunction unless the

plaintiff is barred by an equitable defense or by false declarations, to the discussion of which we now turn.

## D. *The Defenses of Laches and Equitable Estoppel*

The principal defenses interposed in these proceedings have been those of laches and equitable estoppel. Defendant asserts with especial vigor that, because of the coupling of the plaintiff's five-year delay in bringing the infringement action with what defendant claims to be prejudice, it would be inequitable to grant injunctive relief. However, for the reasons which follow, we do not find that the defenses of laches or equitable estoppel have been made out.

■ ■ It is a settled principle of trademark law that laches, in the sense of mere delay, will not generally bar the plaintiff's request for injunctive relief, although it may bar an accounting for profits. 4 Callmann, *supra* § 87.3(b), p. 125. However, it is equally well-settled that the principles of laches by estoppel or equitable estoppel, if proven, will bar all relief. 4 Callmann, *supra* § 87.3 (b), p. 126. "To invoke an equitable estoppel . . . against the plaintiff, he must be chargeable with *inexcusable* delay which *prejudiced* the *innocent* defendant." (emphasis added). 4 Callmann, *supra* § 87.3(b), p. 127. These concepts were applied in Anheuser-Busch, Inc. v. Du Bois Brewing Co., 175 F.2d 370 (3d Cir. 1949), where the court held that after 31 years delay the plaintiff was guilty of "inexcusable laches." On that point the court was defining laches as mere delay, as is so often done in trademark cases and noted that it would not bar relief. However, on those facts, the court found more than mere delay and held that the plaintiff was estopped from asserting its claim.

The varying visage of the term "laches," *i. e.*, "laches in the sense of mere

23. The dominant portions of the names is what causes confusion and the addition of second names does not lessen the confusion in the minds of the purchasers. Rob-

ert Bruce, Inc. v. Sears, Roebuck & Co., 343 F.Supp. 1333, 1345–1346 (E.D.Pa. 1972) and cases cited therein.

delay," "laches without more," "laches by estoppel," has only muddled the concept as it is used in trademark law, for restricting the definition of laches only in terms of delay does not comport with the classic definition. In Sobosle v. United States Steel Corp., 359 F.2d 7 (3d Cir. 1966), the court stated:

"Laches, of course, requires more than lapse of time; as an equitable defense it is determined in the light of all the existing circumstances and requires that the delay be unreasonable and cause prejudice to the adversary."

359 F.2d at 12. While mere delay may not bar relief, we believe that laches does. In any event, we agree with the *Sobosle* court that laches and equitable estoppel are similar and we will discuss them together, recognizing that the defendant's intent is an equitable consideration under either.

 ██ The most recent pronouncement on the subject in this circuit is found in Jenn-Air Corp. v. Penn Ventilator Co., Inc., 464 F.2d 48 (3d Cir. filed June 27, 1972), a patent infringement case in which the defense of laches was interposed. The court applied two principles which are most pertinent here. First, it affirmed that "it is sound law . . . that it [the plaintiff] is not necessarily bound to take on more than one infringer at a time [footnoting with approval Clair, et al. v. Kastar, Inc., 148 F.2d 644 (2d Cir. 1945) (Judge Learned Hand)]." Second, notwithstanding the delay, the court held that no prejudice occurred where "all that happened to it [the defendant] was its continuance of counterfeiting and selling its infringing product."

 In our prior discussion, we made the following subsidiary findings of fact: (1) the defendant applied for registration on August 19, 1963, claiming use since April 18, 1963; (2) the plaintiff's president learned of the defendant's use in July or August of 1963; (3) the plaintiff learned of the defendant's pending application in October of 1963 but refrained from instituting common law action on the advice of counsel and with belief that the matter would be resolved in the Patent Office (see n. 15); (4) the defendant's application for registration was not published for opposition until June 7, 1966; (5) the plaintiff filed a Notice of Opposition and on October 21, 1966, a default was entered in favor of the plaintiff; (6) the plaintiff filed the instant suit on February 28, 1968; and (7) the plaintiff was engaged in the interim in the prosecution of at least four infringement suits against other defendants who had not elected to file in the Patent Office. Our ultimate finding was that the plaintiff had acted reasonably and had not slept on its rights.

It is the plaintiff's contention that, under the circumstances, its delay in bringing suit was justified, and that it acted reasonably by attempting to resolve the matter in the Patent Office via the opposition procedure, and, indeed, in assuming that such was defendant's desire after it had chosen the Patent Office as a forum for so doing. Plaintiff points out that the three year delay in publishing the application for registration was the responsibility of defendant, and submits that, after receiving the plaintiff's Notice of Opposition, the defendant acted at its own peril by continuing to use the "Dunhill" mark. Moreover, plaintiff argues that it had the right to assume that Kasser would at least accede to the decision in the Martinoni case after trial of the issue, if it did not abandon the mark after its own default.

We find that the principles recited in *Jenn-Air* are controlling here. While in *Jenn-Air* the period of delay was 2½ years, the plaintiff was pressing its rights against only one other infringer. Here, the plaintiff has been diligently asserting its trademark rights against at least four other alleged infringers during the five year period of delay. Other cases support this conclusion. In Electronic Communications Inc. v. Electronic Components for Industry Co., 443

F.2d 487 (8th Cir. 1971), there was also a delay of five years before the plaintiff filed an infringement action. However, the court stated:

> "Plaintiff had a valid reason for delaying institution of this action. It was engaged in litigation on the same subject against another company for the purpose of protecting its trademark and the present action was commenced shortly after termination of the New York litigation."

443 F.2d at 490. Likewise, in Hotel Sherman, Inc. v. Harlow, 186 F.Supp. 618 (S.D.Calif.1960), the court held that a delay of four years and four months was excusable because the plaintiff was awaiting the outcome of similar litigation elsewhere. We also view the Patent Office proceeding as analogous to litigation. Moreover, the plaintiff's position is even stronger because it was awaiting the outcome of litigation against the present defendant, instead of other parties. A favorable opinion in the Patent Office or Court of Customs and Patent Appeals would certainly have been of enormous weight in any subsequent infringement action, if any were necessary.

Even if the other infringement litigation would not suffice as sole justification for the delay, we find additional grounds to justify it. Even though, as a general rule, proceedings in the Patent Office determine the right to register and not the right to use, it seems reasonable to us for plaintiff to have believed: (1) that defendant was serious about its application to register the mark; (2) that, notwithstanding the delay in publication which was caused in no small part by defendant's failure to file prompt responses to the Examiner's decisions, there would, since the defendant had chosen the Patent Office as a forum, in due course be a trial of the issue; and (3) that successful opposition would cause the interloper to cease using the mark. Moreover, the law permits a defendant the choice (in good faith) of the course least costly to both parties in terms of money and court time. The fact that in four other instances plaintiff filed infringement suits against other parties seeking to use plaintiff's mark does not inveigh against its position in this case where it delayed such action for in the other instances the defendants had not attempted to register their marks in the Patent Office and plaintiff did not have a choice between the Patent Office procedure and a lawsuit in order to dissuade use. We believe that the statutory procedure for opposition by a registered owner of an identical mark would become meaningless if the owner must file a lawsuit before the application is accepted for publication for opposition.

It is not clear on the record why defendant defaulted in the opposition proceedings. Perhaps it was a tactical decision. In any event, the fact that the Patent Office opposition proceedings terminated without trial of the issue does not weaken the position of the plaintiff here. We remain unconvinced that the courts must be clogged with proceedings contemporary yet parallel to those ongoing in the Patent Office which interested parties have a right to believe may conclude a matter. If this proposition states too much, at least one who refrains from bringing suit for infringement pending the outcome of Patent Office proceedings which terminate in default, need not suffer defeat for laches or estoppel.

We also find that the post-default delay (October 1966–February 1968) was not inexcusable. Following a successful opposition, it was reasonable for the plaintiff to assume that the defendant would voluntarily discontinue use of the mark, though probably with longer attendant delay than would be the case if it were under a court order following a successful infringement action (the defendant would have had to have time to phase out its existing inventory of bottled scotch, labels, etc.). Alternatively, as noted above, plaintiff might have assumed that defendant would discontinue its use if the *Martinoni* proceedings were determined in plaintiff's favor. In any

event, plaintiff's lawsuit followed within an acceptable time period.

■ Defendant has asserted that the Notice of Opposition did not put the defendant on notice as to the plaintiff's rights or that it meant to monopolize its trademark. We do not find that any notice was required in the context of these facts. In any event, however, we do not agree with defendant's contention.[24] While a Notice of Opposition may be filed by "[a]ny person who believes that he would be damaged by the registration", 15 U.S.C. § 1063, the grounds on which the Notice of Opposition was based were virtually identical to those required in an infringement action, i. e., likelihood of confusion of source. While a successful opposition only acts to prevent registration and not use, as a practical matter, it puts the defendant on notice that, at the least, the plaintiff is not going to "sleep on its rights," and indeed, in our view, goes even further and puts the defendant on notice that the opposer also protests its use of the confusingly similar mark.[25] Thus, the defendant acted at its own peril when it continued to use the mark after the default in the Patent Office.[26]

The defendant urges us to consider one other point in evaluating the reasonableness of the plaintiff's delay. It cites Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (2d Cir. 1964) for the proposition that if the products involved were non-competing, the senior user must assert his rights "early." However, "early" is a relative term. Even if we accepted the defendant's position that there was a delay of five years without protest, *Chandon*, and the precedent on which it relied,[27] involved periods of delay far in excess of five years, notwithstanding that in those cases there were other facts favorable to the defendant which are not present here. In addition, the notion that an owner of non-competing goods must assert his rights earlier than an owner of competing goods does not appear to have been accepted by any other circuit or commentator.

For all of the foregoing reasons, we hold that the plaintiff's delay, viewed in segments or as a whole, was not inexcusable or unreasonable. *See* Palisades Pageants, Inc. v. Miss America Pageant, 442 F.2d 1385, 1389 (C.C.P.A. 1971).

24. Defendant has cited a line of cases including Merrick v. Sharp & Dohme, 185 F.2d 713 (7th Cir. 1950), cert. denied 340 U.S. 954, 71 S.Ct. 573, 95 L.Ed. 687; Sperry Rand Corp. v. Sunbeam Corp., 285 F.2d 542 (7th Cir. 1960); Topp-Cola Co. v. Coca-Cola Co., 314 F. 2d 124 (2d Cir. 1963); Acme Feed Mills, Inc. v. Quaker Oats Co., 313 F.Supp. 1156 (M.D.N.C.1970), which hold that a Notice of Opposition is not a charge of infringement. Those cases arose when the plaintiffs attempted to register their trademarks and the defendant filed a Notice of Opposition in the Patent Office. Thereafter, the same plaintiffs filed a Declaratory Judgment action in the district court seeking a declaration of the plaintiffs' right to register and use their trademarks. The respective courts held that the defendants' Notice of Opposition was not a charge of infringement so as to present an "actual controversy" with respect to infringement as required in the Declaratory Judgment Act. But, the effect of the Notice of Opposition in this case is presented in a wholly different context.

25. We note that defendant could have pleaded laches in its answer to the plaintiff's Notice of Opposition. 15 U.S.C. § 1069.

26. *Cf.* Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., 105 F. 2d 908 (2d Cir. 1939), holding contra. Nonetheless, whether the Notice of Opposition is effective notice to the defendant would only effect the 15-month post-default delay. We have found that this delay was not unreasonable not only because of the Martinoni proceedings in the Patent Office and other infringement litigation, but also because it was reasonable for the plaintiff to give the defendant time to phase out its existing Dunhill scotch.

27. Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822 (2d Cir. 1943); Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961), cert. denied 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed. 2d 25; Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp., 308 F.2d 196 (2d Cir. 1962).

 Defendant's other contention in support of its equitable defenses is that after five years of use without protest from the plaintiff, it would be severely prejudiced if it had to discontinue use of the Dunhill mark. Defendant contends that it acted in good faith in adopting the mark and that since it has innocently cultivated the sales and goodwill of its scotch to the point where it is the fourth best selling scotch in Pennsylvania, as a matter of equity it would be unjust to enjoin its use.

At the outset, we note that the plaintiff did not affirmatively mislead defendant, or even impliedly acquiesce, in its use of the mark. *Cf.* Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., 119 U.S.P.Q. 325 (S.D.N.Y. 1958). Indeed, plaintiff (on advice of counsel) did not notify defendant of its objection to its use of "Dunhill" until filing of the opposition proceedings. The defendant's sole reliance, if any, emanated then from the plaintiff's silence for three years as we see it and for five years at most. Defendant's operations would undoubtedly be disrupted, at least for a time by the discontinuance of the use of the Dunhill mark and it might indeed not be able to replace it with as good a seller. However, in light of our finding that there is likelihood of confusion, the success of the defendant's product at least in part may be attributable to the confusion of source. In any event, the holding in *Jenn-Air* (see discussion *supra*) ineluctably requires the conclusion that the defendant has suffered no prejudice where nothing more is shown than that it has continued to sell the infringing product for the period in question. In any event, we agree with the court in Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 615 (7th Cir. 1965), which observed:

"If this prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay."

Moreover, at least part of defendant's success with the infringing mark, the loss of which would, it is claimed, be prejudicial, may be attributable to the confusion of source.

 Finally, as we have previously found, the defendant cannot be classified as an innocent infringer. The defendant adopted the trademark "Dunhill" and the tradename "Dunhill Distillers" knowing of the plaintiff's reputation and image. It would seem that many other marks existed that could have been used to denote "stability," "age," "British flavor," etc. Our finding, while not of fraudulent intent, is such that we can say that defendant assumed the risk that it might be infringing on the plaintiff's rights when it adopted the same mark on related goods and was fully aware of the plaintiff's mark and reputation.

Failing to find inexcusable delay, prejudice or innocence, we hold that defendant has sustained neither the defense of laches nor that of equitable estoppel.

E. *The Fourth Affirmative Defense*

The defendant has asserted that some or all of the plaintiff's trademark registrations were procured by false and fraudulent statements made under oath to the Patent Office, and, therefore, the plaintiff is guilty of "unclean hands" and must be denied all relief. While the defendant has strenuously argued this point, we need not dwell upon it.

 We have found as a fact that the registrations in question were not procured fraudulently since the unintentional misstatements were corrected before the marks were registered or were matters of judicial or of common knowledge. We incorporate those findings here,[28] and conclude, as a matter of law, that the registrations in question were not procured by fraud.[29] *See* Hav-

---

28. We also note that there is no evidence that the petition to cancel SCOA's registration has been adjudicated.

29. The matters set forth in the Fourth Affirmative Defense were also the basis of a counterclaim, the trial of which was severed, essentially to await the out-

iland & Co. v. Johann Haviland China Corp., *supra.* In any event, the validity of the registration will not affect the plaintiff's common law trademark rights, for the right to exclude others arises from use, not registration. Morehouse Manufacturing Corp. v. J. Strickland & Co., 407 F.2d 881, 888 (C.C.P.A.1969); National Trailways Bus Systems v. Trailway Van Lines, Inc., 269 F.Supp. 352 (E.D.N.Y.1965); House of Westmore v. Denney, 151 F.2d 261 (3d Cir. 1945); Simmons Co. v. Cantor, 57 F.Supp. 992 (W.D.Pa.1944). Since our conclusions are based on the plaintiff's common law rights as well as statutory rights, the defendant's fourth affirmative defense would fail, even if the registrations were fraudulently procured.

### F. *The Relief to be Granted*

The findings and conclusions which we have set forth above require us to grant injunctive relief. Defendant is in effect a wholesaler. Because quantities of Dunhill scotch are doubtless presently on the shelves of Pennsylvania and other state liquor stores as well as package stores, and because the defendant has undoubtedly set in motion advertising and promotional campaigns for the forthcoming holiday season, we will make our permanent restraining order effective January 1, 1973.

In addition to an injunction, the plaintiff's complaint asks this Court to award an accounting. However, plaintiff has not actively pursued this request in pretrial conferences, at trial or in its briefs. Indeed, plaintiff's counsel informed the Court on several occasions during pretrial conference that his purpose in this litigation is to obtain injunctive relief. We accept and honor counsel's representations. Even in their absence, however, we would be constrained to refuse an accounting.

In our opinion in Robert Bruce, Inc. v. Sears, Roebuck & Co., *supra,* we outlined the equities to be considered in determining whether to grant an accounting or award damages for trademark infringement, and we find those criteria to be applicable here. Balancing the equities on this issue, we find that they do not support an accounting or damages for the following reasons: first, there is no evidence of any actual confusion; second, plaintiff has not indicated that it has any concrete evidence of pecuniary harm suffered (indeed the goods are non-competing); third, the substantial costs of an accounting would far outweigh the likelihood of the plaintiff's success in establishing any rights to the defendant's profits, and fourth, we feel as a matter of equity that an injunction will fully protect the plaintiff's rights.

come of this case, for if the defense fails, so must the counterclaim. In its counterclaim the defendant noted that procuring a trademark registration through misrepresentation of facts to the Patent Office can be the basis of a counterclaim for violation of the antitrust laws, relying on Walker Process Equip-

ment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L. Ed.2d 247 (1965). We would be less than candid were we not to view the severed counterclaim as defensive in nature. In view of our findings on this matter, we will dismiss the counterclaim.